The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right, we are ready to proceed. May it please the Court, Ms. Lemon is an employee under Title VII of the Civil Rights Act of 1964 because her employer, Myers Bigel, had the right to control the manner and means of her work. The District Court ignored that reality and instead improperly focused first on whether the employer exercised actual control over the manner and means of her work and also improperly focused on the corporate governance structure of the employer. There are three reasons why Ms. Lemon should be considered an employee subject to the protection afforded by Title VII. First, the corporate structure adopted by Myers Bigel is consistent with Ms. Lemon being an employee. Second, the written employment policies adopted by Myers Bigel give it the right to control the manner and means of her work. And third, the employment practices demonstrate that it exercised control over the manner and means of her work. Myers Bigel is a North Carolina professional association, which under North Carolina law is treated as a C-Corp with shareholders, a board of directors, and officers. The District Court mistakenly relied on this corporate structure to conclude that Ms. Lemon was not an employee. In its analysis of the first factor of the Clackamas test, whether an organization can hire or fire an individual or set the rules and regulations of the work, the Court relied on the fact that Ms. Lemon signed a shareholder agreement, served as a director, and occasionally served as an officer, yet employees of corporations can be, and often are, shareholders or members of the boards of directors and officers. The focus should be on who is the most able to control firms' practices and, as a consequence, are least vulnerable to the historic treatment prohibited by Title VII. The District Court's approach fails to meet the remedial purpose of the test. The reliance on business structure is the approach taken by the dissent, Clackamas, and is inapplicable here. Let's look at the remedial purpose. Mr. Seymour, this is Judge Diaz. Can I interrupt for a second? Yes, you may. So in any kind of a structure, business structure, there are going to be a cadre of people who are going to be in charge of the day-to-day operations of that organization, whether it be the officers or some manager that's appointed. But it can't be the case, right, that simply because you have that structure as you had here with this woman partner who you say managed or controlled the operations of the law firm that the partners in a law firm, simply because they appoint a subset of themselves to manage the operations, thereby suddenly convert themselves into employees, right? So what is it about this case that's different? Well, in this case, the actual policies and the operation of the day-to-day operations show that in its function and its setup, it made Ms. Lemon the same as an employee. For example, upon her initial employment in 2001, she signed an employment agreement, and it survived when she became a shareholder. Section three of her employment agreement reads in relevant part, this agreement shall be terminated upon the offer of any stock in the employer by the employee. So why would it survive the shareholder agreement because of the transformation of status? Well, first of all, by its terms, the shareholder agreement was designed to include her time as a corporation because it said that she didn't become a shareholder until 2009. But in 2001, the terms of the contract said that upon offer of any stock in the employer. So that was forward-looking so that she was, in fact, an employee subject to the employment contract at the same time she was a shareholder. And there's nothing inconsistent with that because employees can be shareholders. Employees can be officers. Employees can be on the boards of directors. So therefore, it's not inconsistent. No. How many employment cases do you have where the individual who served on a five-person management committee and served as an officer of a firm as vice president, secretary, are ruled to be employees? Well, there aren't many because this is a matter of new impression. And I believe that this is an appropriate case to make this decision. Will you please, if I'm trying to ask a question, you just keep talking. I'm sorry. All right, thank you. I'm glad you say there aren't many cases like that. I mean, when I was reading this, I don't, at least in my experience, I couldn't recall any cases where someone was an equal owner of the firm or had an equal number of shares and had served as the director of the firm and on the board and on a five-person management committee and an officer of the firm and was ruled an employee. So wouldn't we be breaking significant new ground with this kind of the whole kind of holding that you are advocating for? Well, we may be. But I think this is an appropriate case to do that because the terms of the employment agreement say the employer may terminate the agreement without cause on 30 days notice. That never happened. The district court said that the bylaws reserve termination of employment of a shareholder to Myles Beagle's board of directors. But the bylaws constitute a binding contract as between the corporation and its members. And what this means is that the employer could terminate Ms. Lemon on 30 days notice by action of the board of directors. Now, this may be challenging. I'm sorry. Doesn't this happen in every partnership? The partnership can vote a partner out. Theoretically, the partnership dissolves and gets reconstituted. But it doesn't function that way. Partnerships all across, especially in law firms, function the same way this firm functioned. She shared in the profits. Her profit was at the risk of a profit and loss was based on the firm enterprise. Her compensation varied. She had paid in capital. And she had voted to admit other shareholders, served on the board, was the vice president. It just parallels a managing partner level of any major law firm. And it seems to me that when a partner of a law firm shares in the enterprise, shares in the risk of its success by a portion of the income, whereas an employee is usually paid a salary and made decisions for the firm, it's almost indistinguishable from the typical old-fashioned law firm partnership. Well, it's important to note that Clackamas abrogated what was known as the economic realities test. Prior to Clackamas, there was a split of authority. The Second Circuit said that if you have a professional corporation, the people are automatically employees. The Seventh Circuit, along with the Eighth and Eleventh, said that a partnership is virtually the same as a professional corporation. Therefore, the shareholders are owners. The Clackamas court rejected that argument. So that argument, the economic realities test, is not binding and we need to look at the Clackamas factor. Which is a factor. I mean, the idea that somebody is in a joint enterprise and the income in that joint enterprise is dependent on the success of the enterprise and the person has a say in the business. You take all these factors into account and I can't figure out how is this distinguishable from the traditional partnership that you're in and that I was in and that we see day to day on the street where everybody practices the law. We have associates and we have partners and partners who share in the equities and in the risks of the firm. And it seems to me here we have a person who functioned completely as a partner, not only as a partner, but as a managing partner. And it's hard to call that person an employee of herself, so to speak. Well, I think that is a possibility here. And I do not agree that the compensation is tied to the profits and losses. And I've explained that in our reply brief. And I encourage us to take a fresh look at this. And I see my time is up. Didn't you didn't she pay something like $62,000 for her partnership's share? She did, yes. Isn't that a classic example of a law firm partnership? Well, I don't think a law firm is necessarily unique because you could have a small family home business, which would be a corporation, and a person could buy stock in that corporation and still be an employee. I don't think that should be what this case turns on. It should be an analysis of the clackamous factors without a preconceived notion that this is a partnership and the old style of business prevails. All right. Thank you very much, Mr. Seymour. And you've got some rebuttal time. Thank you. Mr. Philbeck. May it please the court. As for Ms. Lemon's Section 1981 claim, the Central Institute relies on the juxtaposition of that claim with the previous, this court's previous decision in McCleary Evans' case, as well as the Supreme Court's decision in Zweig-Rulitz. Section 1981 essentially provides equal protection in the banking performance of contracts among people of all races. In her complaint, Ms. Lemon alleged that she was denied the benefit of the STL leave status, which is normally a ministerial act for those outside the protected class, as well as the defendants took extraordinary measures in requiring her to provide, appear before the whole board of directors and present a case, get medical records that it didn't require others outside the protected class to provide and the like. The district court actually found that Ms. Lemon was in fact treated differently from the others as far as her allegations. Who were white and who sought to participate in the STL plan. The question in the district court's frame was whether she alleged sufficient facts showing that defendant's denial of the STL benefit was under circumstances given rise to an inference of discrimination. That's the fourth factor of a prima facie case. And the court cited this McCleary case. Well, McCleary decided in 2015 the plan was an African-American who applied for two state positions in which she was, quote, more than qualified by her allegation. She was not selected for either position. She alleged the decision makers were biased and had predetermined that they would not select, that would only select white candidates to fill the position. She didn't allege any irregularities and significantly, she made no allegation that she was the most qualified or that the others were inferior in qualifications. So the district court found that this fell short under Iqbal Twombly because the conclusions, because the allegations were conclusory and you would have to show something more to indicate that the denial of some short-term leave was racially motivated. And the problem is that the pleading here is just what used to pass muster under the old Rule 8 standard. But that Iqbal and Twombly required something more, and that is that there was a plausible claim that Caucasian attorneys request for short-term leave were granted, whereas hers was not. But that doesn't answer the question of was race the reason for any difference in treatment? That was the missing piece, according to the district court, the missing piece was the animus. That is correct, Judge Niemeyer, but we don't think the district court considered the departures from normal procedural and substantive sequences that provide evidence of racial discrimination as determined by the U.S. Supreme Court in the Village of Arlington Heights case. We did allege that upon receiving the formal STA request, the defendants violated their own policies and normal practices. Number one, it was a ministerial decision made at the management committee level. However, the defendants permitted that at the management committee level for all those outside the protected class. However, for Ms. Lemon, she had to provide additional medical documentation that was never required of those outside the protected class, and we allege that she was required to present her case with all the personal and private information that goes with that request to the entire board of directors. That's a fairly large body. It's not necessarily a few people that just need to know, as it was treated in the past. And when she provided all that presentation, she submitted to a vote before the board of directors, when before it was a management committee level decision. Additionally, she alleged the racist comments that was made by one of the decision makers at least four months prior to the decision about her always playing the race card, quote, unquote, when she had never ever complained about race within the workplace prior to this STL issue. And we think that given that with the circumstances that given rise to the inference of race discrimination under McDonnell-Douglas test, which is a summary judgment analysis, the Supreme Court has even said it should not be onerous. We would respectfully submit that we did raise some plausible facts in our allegations that would give rise to it being a racial animus. Mr. Philbeck, this is Judge Diaz. Your time is up, but I wanted to ask you about the recent back and forth in the 28-J letters about Comcast and how, if at all, that changes the sort of the analysis of this claim. I mean, it appears on this record that you may have shown that racial animus may have influenced the board's decision or alleged that animus may have been a part of it. But Comcast seems to suggest that the plaintiff has a more onerous burden to show that racial animus was the but-for cause for whatever the action was that was taken against her, in this case, the failure to grant disability benefits. So can you talk about Comcast and how, if at all, it hurts your case? Yes, thank you, Judge Diaz. When I mentioned the mixed motive theory, I mentioned it in passing as being something that would even augment even more what the causation standard would be. I mentioned it because I knew the Comcast decision was pending, and then it went back and forth in the briefing. But I think, and clearly the court says, mixed motive theory does not apply to Section 1981 claims. However, I did also raise the recent decision in Bostock where Judge Gorsuch held on behalf of the court that but-for cause is a sweeping standard. And I think that was added to the jurisprudence that the district court did not have the benefit of seeing that particular definition because Judge Gorsuch says there's multiple causes that can support a because-of or but-for causation. And so I think with the Bostock decision in explaining the sweeping standard of what a but-for can include, I think it does encompass where if we do raise allegations that could be racial discrimination, that we show the right to pursue that in discovery to determine whether it's a determinative factor. I hope that answers your question. Okay, thank you. To what degree are we allowed to consider the fact that the firm that wanted her to serve as a director of the firm and on the five-person management committee and as an officer and vice president and secretary, how likely is it someone that had, that a counsel is motivated here by racial animus? It seems to me that when you-that the two claims are not-the Title VII claim and the Section 1981 claim are not unrelated because this is a firm that appeared to want to give the plaintiff every chance and to have her as a part of the decision-making process. Judge Niemeyer, I'm not sure that I would agree that the firm reached out and tried to make her part of the decision-making process as stated in the allegations. I think to the contrary, you got the Title VII issue where she was excluded and was arguably efforts to make her to quit or resign or be fired under the Title VII analysis. But then later, months later, comes the Section 1981 issue with the STL leave. And granted, it could be related to the Title VII as well if she's found to be an employee. But aside from that, because of how they treated a-even cited alleged example of a white employee who was not qualified but yet was allowed to participate in STL program. Right there, that's, you know, a race issue and we should be entitled to explore that to determine in discovery whether that was a determinative factor. Thank you, Mr. Philbeck. You've said that you've called me-this is Judge Wilkinson. You've called me Judge Niemeyer several times and I want to say how flattered I am. I apologize. No, no. I want to say how you flatter me. I'm happy any day of the week to be confused with Judge Niemeyer for whom I have the greatest degree of respect. You notice that I remain silent because I'm not very good. Understood. All right. Thank you very much for your argument. And let's hear from-is it Mr. Shadd? Good morning, Your Honor. It's Ms. Shadd. Thank you. Excuse me, please. I'm sorry. Ms. Shadd. No concerns at all. Thank you. Good morning. Your Honor, along with my colleague, Isaac Lenartz, we represent Myers Beagle and its former managing partner, Ms. Lynn Borchers. I'm going to address the Title VII issues and Mr. Lenartz will address the Section 1981 issues. Your Honor, to cut to the chase, if the allegations in this case are sufficient to confer employee status under Title VII on an equity shareholder owner of a 25-member law firm, then Title VII coverage is going to be the rule for shareholders and partners in law firms and other professional service firms rather than the rare exception that courts and federal agency has, up to this point, deemed it to be. And to respond, Judge Niemeyer, to your question and to your comment, there is nothing distinguishable about this case and these facts and this arrangement between Myers Beagle and Ms. Lemon from the traditional partnership that I'm in, that you all have been in, and we are not aware of any case where, on facts like these, a party has been found to be an employee. And Judge Wilkinson, you asked if this would be a shift, would break new ground. With all respect, it's not just going to break new ground. It will be a seismic shift in the law in this area. So, it is our position, and your honors focus properly on exactly, really, what we believe are the outcome determinative, undisputed, alleged, by Ms. Lemon, facts. And there are, you know, 10 or 11 of them that she simply cannot overcome. She was an equity shareholder for over nine years. Can I interrupt? This is Judge Diaz here. So, I wanted to say that so I wouldn't be confused with my two colleagues up front, both of whom I have great respect for as well. So, with respect to the employment agreement, is it your position that once Ms. Lemon signed the shareholder agreement, that the employment agreement was null and void? And if so, where is that indication or evidence in the record? Thank you for the question. It is our position that when she became a shareholder in January of 2007, that she was no longer an employee. The shareholder agreement itself, it does have a merger clause in it. You know, that this is the entire agreement between the parties provision. So, there is that in the original shareholder agreement that she signed in 2007. In 2009, she and the 19 other shareholders signed a modification to the original shareholder agreement that removed every reference to employee and employment with respect to shareholders. That was the sole purpose of the modification, by the way. That's in the record. And then, in the facts of what actually occurred after she became a shareholder, as a shareholder, she could not be fired just because somebody wanted to fire her. She had a protection that she could only be fired by a vote of other shareholders. So, she was not subject to termination as she had been previously while an associate lawyer at the firm. She did not own any part of the firm. She did not get a vote on any issue of the firm's business. As an associate, she knew what she would make every year. As a shareholder, when the year started, they had maybe some idea what they might make, but they could make more. They could make less. They could go into the negative. That was possible. That's classic equity partner in a law firm structure. So, back to the direct question, Judge Diaz, the 2001 employment agreement did not continue to apply, and it certainly wasn't relied on, used, referred to. And I think in their reply brief, appellants even say that there was never any exercise or even attempted exercise of authority under that agreement. I mean, as I... Well, I mean... Go ahead, Judge Wilkinson. Go ahead. Go ahead. Okay. Thank you. Your colleague on the other side, I think concedes, perhaps, maybe he doesn't, that there was no actual attempt to control, although maybe not fully. But he makes the point that it's not just whether or not there was an actual attempt to control, but whether or not the governing documents gave the employer the authority to do so. And he points to a number of provisions in these various agreements. For example, the provision that allowed for review of her work as a shareholder, which I think applied to everyone. The fact that the agreements indicated that Ms. Lemon was required to use her sole and the firm, the fact that the partner in charge of the chair of the board of directors, who's a defendant in this case, essentially had sole authority for managing the firm and effectively had veto power over decision-making in day-to-day operations. And I know you dispute that. But her point is that even if the firm chose not to exercise control, that the record evidence in this case at least suggests the ability to control. Yes, and thank you for that question. There is no case that says that the reserved, unexercised right to control is sufficient. All of the cases include allegations of actual control. Even the case that appellant cites for this proposition, the Browning-Ferris case, says that an unexercised right to control is a factor. It's a factor. But they specifically say that in that case, they weren't even deciding whether reserved but unexercised authority alone could actually be sufficient. That was a joint employment case under the National Labor Relations Act. So there is no case where an unexercised right to control is legally sufficient to confer employee status. No case that we found anyway, and no case cited to us. Well, it seems to me that if each of us reflects on the real world, every law firm has built-in aspects to manage conflicts of interest, where the firm controls whether a particular partner takes a case, over malpractice type of issues, over the control that a particular partner exercises over whether to protect against statutes of limitations and that type of thing, over shared clientele where the partners want to have a say in somebody else's because of client relations. It seems to me inherent in the nature of a partnership is the collaboration in delivering professional services. And the test is a little bit whether a person at issue is working for the partners or is working with the partners to carry out the enterprise and shares in the risk of the enterprise. Indeed, the Supreme Court's Backamas case provided that one of the important factors in making the determination is whether the individual shares in the profits, losses, and liabilities of the organization. All those factors are applicable here, like in the law firm. Yeah. Judge Niemeyer, I couldn't agree with you more. That's exactly right. And context matters. The fact that this is a law firm matters. It's not a widget company with line manufacturing employees. It's a law firm. And yes, and we've cited cases for the proposition that just because a partner has another partner weigh in on their work or even tell them to do something differently doesn't make that first partner an employee. I mean, you know, if I, as the senior partner on this case, didn't like something that Mr. Lenart's put into the brief, I'm going to take it out before it's filed. That doesn't make him an employee. I mean, that's just the nature of the profession. It's the way we work together. It's the way law firm partnerships operate. And our position is that the facts in this case as alleged, which are undisputed, legally require this outcome of dismissal. She cannot overcome these facts. There's no question that she shared in the revenues and the profits and the losses. I mean, look at the formula. It's right there. And again, Judge Diaz, back to your question, you know, the fact that there was a quality control policy in place. You're correct. That's a policy that the firm of which she was a member and a voting member put in place that applied to everybody. And it only makes sense. This is a patent law firm. It's high risk. It's hyper technical. You know, the fact that lawyers reviewed other lawyers work before it got submitted. You know, that's a great risk management tool. You know, you would see the same thing in securities filings, I'm sure, where you've got high risk and hyper technical law being practiced. So there is nothing, nothing unusual about this relationship. And she has not pleaded any facts that undermine the facts that we're relying on. That's the problem that I have is that I don't see limiting principle to this. And if we were to sustain claim, I think that there would be arguably applied to every law firm in this country because the arrangements here are so completely typical. There's no way to there's no way to cut it off. There's no way to a distinguishing principle that distinguishes all firms from every other law firm. And this is if you were looking for a sort of a prototypical description of how a law firm normally operates, you would look at this case. Judge Wilkinson, I again, I couldn't agree more strongly with you. And I do think that there really is no way to limit this and the floodgates will open and it's not at all what Title seven was intended to apply to. And I just think it would be legally incorrect, just flatly incorrect. I suppose in this changing world of law practices, we now have non-equity partners and other of counsel relationships that could blur these factors. But that is not what's presented in the allegations of this complaint. But I just make that notation because there are associates, there are super associates or non-equity partners, so to speak. And there are of counsel lawyers who provide more limited input to the firm. And all of those might have to be addressed differently if that case came. But in this case, of course, Simon is a typical partner and a managing partner of a law firm. Seems to me most of the aspects she alleged are repeated throughout the law firm community. Yeah, Judge Niemeyer, I think that's right. I think there are a subset of cases that could potentially effectively be brought by non-equity partners, income partners of counsel associates, for sure. That's not this case, though. And also, I'm not suggesting that they would be employees. I'm just suggesting that the circumstances of those relationships might blur, might be more difficult to apply. That's right. They may well be able to survive a Rule 12b6 motion. Yes. Ms. Shadd, this is Judge Diaz. One additional question. So the one area, I suppose, where this case, at least according to your opponent, is suggested as close to the Sidley Austin opinion, where we had this self-perpetuating executive committee that essentially co-opted power onto itself. And at least according to that opinion, effectively made the partners outside of the committee partners in name only. And your opponent on the other side says that, at least in some respect, the situation here wasn't that much different because of the sort of the extensive influence of misfortuners in the day-to-day operations of this firm, which they allege effectively negated the authority of the other partners. Could you speak to that? Yes, sir. And thank you for the question. First of all, I don't think there are sufficient facts alleged, only conclusions that Ms. Borchers controlled anything. In the Sidley case, the self-perpetuating board, they were not elected. That's not the case in this situation. Ms. Lemons had a vote on everything. The self-perpetuating committee in Sidley determined compensation for everybody else and didn't tell anybody else how they got there. It's all secret. That's not at all the case here. And we've cited cases in our brief, a number of them, that stand for the proposition that the really critical question in these cases is, does the partner have the right to vote? In this case, it's undisputed that Ms. Lemons had the same vote right to vote and exercise that right to vote as every other owner in the firm. The fact that her vote didn't carry the day, that she didn't like the result, that she didn't persuade others to vote the way she voted, is inconsequential to the legal question of control. And I've had the good fortune of serving in my prior life on several boards of directors and there's always a – it's never a question of equal control. I mean, it's never a completely equal situation because every board has an executive committee. And the executive committee is – you know, the board may be 15 or 16 or 20 members, and the executive committee may be four or five. And the executive committee is a mechanism that is employed in order to bring about efficiencies and to avoid what are the sort of unwieldy characteristics of management through a 15 or 20-person body. But I've never thought that the creation of an executive committee or management committee or whatever introduced a degree of inequality, for example, such as to make board members who were not members of the executive committee somehow persons of second-class status or employees. I mean, that is just the way firms operate and the way boards operate. If the executive committee makes an awful lot of day-to-day decisions and then when something is really important, they take it to the full board or they may seek a ratification before the full board or whatever. But this, again, strikes me as a prototypical kind of thing. And the fact that some people may be on the inside of a board or relatively or that a small group may have influence, that's just – I mean, that's just standard operating procedure, isn't it? Yes, sir. That's life. I mean, that's just the way it is. That's – you know, and in this case, unlike some of the cases involving law firms, Ms. Lemon actually had an equal vote. She didn't have a lesser vote than somebody else who maybe was a more important or more powerful partner. They all had one vote, one equal vote on everything. And she alleges, and it's undisputed, that the business of the firm was conducted by the board through the management committee but ultimately by the board of which she was an equal and participating member at all times since 2007. All right. Do you have anything to add, Ms. Shadd? No, sir, other than to say that I think Judge Flanagan was 100 percent right on this one. All right. We've – do either of my colleagues have any questions? Judge Niemeyer, Judge Diaz, do you have any questions? I think we've covered Ms. Shadd's position well. I do not. Thank you, Judge Wilkinson. I think you're up next. Would you like to come forward and give us your argument? Good morning, Your Honors, and may it please the Court. Isaac Lenartz on behalf of the Appellees Myers-Beagle and Lynn Borchers. Under Section 1981, plaintiff had the burden of pleading that race discrimination was the forecause of the board's decision that she was not qualified to invoke the firm's STL plan. As an initial matter, there are no factual allegations that Myers-Beagle's former managing partner, Lynn Borchers, did anything that caused plaintiff's STL request to be denied, much less that she did so based on plaintiff's race. In fact, there are only two areas where plaintiff's factual allegations  and neither of those connects the dots in a way that plausibly suggests race discrimination. First, plaintiff alleges that four months before the STL decision by the board, one shareholder in the firm told another shareholder that plaintiff, quote, played the black card too much, unquote. That alleged comment, however, does not support an inference of race discrimination. It was a single comment made by one shareholder to another shareholder, and there's nothing in the complaint that plausibly links that comment to the decision by the full board by a 17-3 vote four months later to deny plaintiff's STL request. And in fact, plaintiff herself, in paragraph 78 of the proposed amended complaint, alleges that this comment was made in a different context and that the reason it was made was to retaliate against plaintiff for having reported gender discrimination during an investigation conducted by outside counsel. The second point that the plaintiff raises race in relation to her STL request is she says she was qualified to file an STL plan, but her STL request was treated differently than requests made by white shareholders. She says she was put through a more rigorous process and her request was denied, while white shareholders had their requests confirmed by the management committee. We see three problems with those allegations. First, plaintiff has not pleaded any facts showing that she was qualified to participate in the STL plan. The district court assumed without deciding that she was qualified, but there's no reason for this court reviewing De Novo to make that same assumption. If plaintiff was suing under the ADA, she could not just allege that she was a qualified individual with a disability. She would need to allege some facts about what that disability was. The same thing is true here. If plaintiff was not qualified to participate in the STL plan, and she hasn't alleged any facts showing that she was, she has not been deprived of any benefit, and thus has no Section 1981 claim. Second, plaintiff has not pleaded sufficient facts to permit a meaningful comparison between her situation and the white shareholders who made STL requests. To draw meaningful inference about different treatment, you need similarly situated comparators. You need an apples-to-apples comparison. This court's Leitner decision, which is cited by the district court's decision at joint appendix 502, makes that exact point. It says, the similarity between comparators must be clearly established in order to be meaningful. There are no factual allegations about what plaintiff's alleged health condition was, so it's impossible to say whether she was similarly situated to the shareholders who compared herself to who invoked the STL plan for cataract surgery and other illnesses. There are also no factual allegations to support her conclusory allegation that one shareholder was allowed to invoke the STL plan, even though that shareholder was not qualified under its terms. We don't know who that shareholder was, what their reason for invoking the plan was, or why plaintiff thinks that doesn't align with the plan's terms. Because of that, it's impossible to draw any inference about whether different treatment the plaintiff alleges was because of her race or for some other reason entirely. Then third, plaintiff herself alleges plausible alternative explanations for the denial of her STL request that have nothing to do with race, specifically gender discrimination and retaliation. In particular, plaintiff repeatedly alleges that her STL request was subjected to rigorous review and ultimately denied because the firm wanted to retaliate against her for participating in a gender discrimination investigation. Those allegations undercut plaintiff's claim that race discrimination was the but-for cause of the STL decision and further distinguish her from the alleged comparators. The bottom line is that nothing in plaintiff's complaint pleads a plausible claim that race was the cause of the STL decision. Mr. Linertz, excuse me, Judge Diaz here, are those explanations necessarily mutually exclusive? The fact that, you know, she alleges that, I assume she would say that she alleges that part of the reason why her benefits application was denied was because she was engaged in this investigation of gender discrimination. But that doesn't necessarily exclude a possibility that the firm also racially discriminated against her, does it? Judge Diaz, I think that's right. I don't think it necessarily excludes the possibility that there was another cause. But what it does is I think it undermines the idea of a comparison. So she relies on comparator evidence. And what makes a comparison possible is when you have similarly situated parties, you know, the plaintiff inside the protected class and the other parties outside the protected class, and they're similarly situated. So you can infer that the alleged wrong was because of the class difference, you know, the fact that plaintiff was in the protected class. Now, plaintiff has alleged in some factual detail that there's a wholly different reason, not related to race, that she might have been treated differently than those comparators. And so I think it undermines her reliance on comparator evidence. What do you think was the reason? Go ahead, Judge Wilkinson. Oh, did I interrupt you, Judge Diaz? If I did, go ahead. Okay, well, thank you. Just to follow up, at the very beginning of your argument, you talked about Comcast and but-for causation. And I know that, I don't know that you had a chance to respond to the 28 J letters that were submitted in this case. But your opponent on the other side says, well, there's been a gloss on Comcast via the Bostick case that suggests that, you know, it's not necessarily the case that you can only have one but-for cause of a discriminatory act. And so my question to you is, is that in any way change the result in this case if we accept that premise? No, Your Honor. I think that Comcast says that you have to have but-for causation in the Section 1981 context. And I agree that Bostick does discuss the possibility that you can have more than one but-for cause. At the end of the day, though, there's not enough alleged, even looking just at the allegations about race, to say that race was the but-for cause of the denial of plaintiff's STL request in this case. So we're still in the area where it's conceivable that that decision was made for a variety of reasons. Because of race, because she was not qualified under the STL plans terms, we just don't because her health condition was substantially different from the alleged comparators because of gender and retaliation for participating in the gender discrimination investigation. So I don't think that it changes the result in this case. What ways was she not qualified for the short-term leave? But why was she disqualified? I don't think we know from the complaint. She says that she was qualified and that she was denied, but she never alleges what her health condition was. She says that she experienced numerous events which qualified her for participation, and two additional independent qualifying events were being experienced by her immediate family members. But she never, never alleges what her health condition was or what was going on with her family. And so it's not possible to compare those health conditions and family circumstances, whatever they were, with the language of the policy itself. But would she have to allege with respect to a health condition, qualify her for the short-term leave? I think, Your Honor, if you look at Joint Appendix 373 that has the qualifications for the qualifications include prolonged physical or mental illness suffered by the shareholder for which leave is recommended by a physician, family leave, maternity, paternity leave for birth, adoption of a child, and prolonged serious illness of an immediate family member or other protracted family emergency that imposes a substantial burden on the shareholder. None of that was alleged in the complaint? None of that is alleged in the complaint. All she says in conclusory fashion is, I was qualified. And so there's no way to evaluate whether that's... But the particular health condition is not alleged? No, Your Honor. And that's information that the plaintiff should have in her possession. She knows what her health conditions are and had the ability to allege that and chose not to. One other question. I mentioned to Mr. Philbeck that I thought looking at the totality of the circumstances here, maybe the Title VII claim and the 1981 claim are not unrelated, because it was hard for me to see how racial animus was behind the denial of a leave request from a director when she was brought onto the board and really served in what at least on paper seemed some positions of real responsibility within the firm. I don't think that a racially motivated firm would be welcoming plaintiff into a position on a management committee and as a vice president and secretary. I mean, it just seemed to me that the overall record here, although there may have been a falling out at some point, but it seemed to me that the motivations were altogether laudatory and that they wanted her to be a part of the decision-making council. As I say, there may have been a falling out. Obviously, there was with the 17 to 3 vote. But there was an effort here, at least on the part of the firm, to make its governing structure more diverse and more inclusive. And that was a good thing. And I wonder if we can take that into account as one among multiple factors. I'm bearing on the 1981 claim. Yes, Judge Wilkinson, I think you can take that into account. I mean, it's been alleged and it's before the court. She was elected to the partnership and given, you know, officer positions in 2016. She was the vice president and secretary. She'd served on the management committee. And while there are other allegations that suggest a falling out, there's no suggestion that it had anything to do with her race, which is the crucial question for Section 1981. The other thing I'll say is the 17 to 3 vote by the board. We just don't know, you know, what the reasoning for that decision was because we don't have any information about her alleged qualification for the STL plan. And so it's really difficult to evaluate whether that's reflecting some sort of falling out or just a reasonable decision based on what the circumstances were. Do you have anything further, Mr. Lennartz? Mr. Lennartz? No, sir, not unless there are other questions from the court. We request that. I'll ask my colleagues if they have any further questions. Judge Niemeyer, Judge Diaz, do either of you have further questions you would like to ask? No, I have none. Thank you. I do not. Thank you very much. Thank you. Mr. Seymour, you have some, you've reserved some time for rebuttal, and we'd be happy to hear from you. Have one rule for law firms and a different rule for all other businesses. It should have the same rule for all forms of businesses. The test should not be, does this look like an old style partnership? The test should be, is there a master-servant relationship that shows that the individual is actually an employee and not a partner or a partner-like thing? Judge Ginsburg, Justice Ginsburg observed that there is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship. You can be both an employee and a shareholder, an employee and a director, an employee and an officer. So that should not be the test that this court adopts. There's nothing... I'm sorry. She was only able to get one other vote. Well, if we look at two things, number one, the right to control, section 16 of the employment contract is sweeping in that she agrees to observe and comply with personnel policies, operating policies and procedures, and all other rules and regulations, and to carry out and to perform orders, directions, and policies stated by the employer from time to time, either orally or in writing. That's not ambiguous. Mr. Seymour, what's your response to the argument that the shareholder agreement had a merger clause in its initial form and then later was amended to eliminate the use of the word employee because it inaccurately described the relationship? That was the argument, I think, presented by your colleague. I don't see the merger clause, Your Honor. But as I understood, and as I read the... When you say you don't see, what's that mean? Well, I think the contract has a merger clause. I'm talking about the shareholder agreement. Well, the merger clause would not act to terminate an employment contract. Of course it would. I mean, if it says this is the entire contract between us and it supersedes all other contracts, it ends the employment contract. That's the position that your colleague, that Myers-Bigel, is taking. Well, we dispute that, Your Honor. Well, that's what I'm asking you. How do you dispute it? What is your argument? That the employment agreement needed to be enforced because... Well, I apologize, Your Honor. I don't have a response to that at this point. If I may... Or is there anything further you wish to add, Mr. Seymour? Yes. I would like to indicate that Ms. Borchers exercised her authority in such a way as to establish herself as Ms. Lemon's direct report, and through that relationship, supervise her. Here's an example. In the October 19, 2016 meeting of the board, Ms. Borchers ordered Ms. Lemon to leave the meeting,  what this is, this demonstrates the power balance between a master and a servant. The power dynamic can be interpreted two ways. How is that distinguishable from any board of directors which excludes a member who is the subject of the discussion? That's a traditional function in a partnership meeting or in a board meeting that when the I can recall when I was in our law firm, we had a very serious malpractice charge against a partner and we didn't quite know how to approach it. We excluded the partner from the meeting and discussed it. Now, it seems to me that would be just ordinary protocol. Well, I don't think we ought to read it that way because this is one example of a pattern in practice that marginalized Ms. Lemon so that if we look at how she was treated generally, then we see that the corporation had the power to set the rules and regulations and Ms. Lemon had to report to someone higher up in the organization and had little if any ability to influence and what this means is you need to take the placibus factors and look at each one of them and not just look at the form of the business as a partnership, but look at the way that the partnership, this organization operated and if you do that, factor by factor, I submit that you will find that there is ample evidence to support a finding that Ms. Lemon was an employee. All right. Thank you very much, Mr. Seymour. Judge Niemeyer, Judge Diaz, either of you wish to question Mr. Seymour further? No, I'm fine. Thank you. I don't. Thank you very much. All right. Thank you very much, Mr. Seymour. Mr. Philbeth? Yes, sir. Do you reserve one minute of time for rebuttal? Thank you. In that time, if I could just make two key points, I think. Number one is that we did allege that Ms. Lemon was qualified for the STL plan. The court assumed it and we actually have allegations where she experienced numerous events throughout 2016 that qualified her for the STL lead participation. She notified Borchers throughout that year that she was experiencing the qualifying events, that's alleged, and that no time did Borchers ever question the seriousness of Lemon's qualifying events or the question of their legitimacy. And then, even most importantly, Borchers followed up with Lemon periodically to determine that Lemon was still, in fact, experiencing the qualified events. That can be construed as an admission right there. Secondly, on the issue of the causation, yes, we do rely on comparative evidence, which we stated there was an employee not of protected class who did not even qualify, but yet was provided the STL leave. But more than that, and this is what's missing from the opposing counsel's commentary, is that there was no mention about the procedural and substantive departures of the policy that was followed, or not followed for Ms. Lemon, but was provided to the others. You know, just because a firm reaches out and gives the outward appearance that it's recruiting females or it's recruiting African Americans and puts them in leadership roles doesn't mean that they won't discriminate against, say, a female or African American if they become pregnant and need leave. So, just because there's an outward appearance of one doesn't necessarily mean that this immediate question of whether she should be granted STL leave, all of a sudden there can't be racial discrimination because, well, they come across as a pretty good and cooperative employer with racial equity. That's not necessarily the case here. If we look at the focus of why that was... Mr. Philbeck, all I was suggesting is we don't want to put ourselves in the position of penalizing firms that make altogether laudable efforts to move toward inclusion and toward diversity. It seems to me that those sorts of efforts, as laudable as they are, should be credited. And that's all I'm worried about, is that I just don't want to penalize those law firms who are trying to do the right thing. I understand, Judge V. Meyer. And what I would say is that should be fleshed out on a summary judgment question, where both sides proffer their evidence, and then there could be a decision made by the trial judge whether there's a genuine issue there. All right. Thank you very much, Mr. Philbeck.  Thank you, Your Honors.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Albert Diaz